# SUPPLEMENT

## OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

In answer to a question, submitted to the Justices under c. 3, art. 2 of the Constitution respecting the constitutionality of a certain pending bill providing for the sale of the property of the Boston Elevated Railway Company to the Boston Metropolitan District, the issue by the district, to procure funds for the financing of such purchase, of bonds with remote and indeterminate ultimate maturities, and for the management and control by public agencies of the property so transferred, the Justices stated that certain provisions, to be incorporated in substance in such bonds and purporting to impose restrictions on the competency of the General Court, after the enactment of the pending bill, to legislate for the public welfare under c. 1, § 1, art. 4 of the Constitution concerning certain aspects of the transportation system by requiring, as a condition precedent to the enactment of such legislation during the indeterminate period until the maturity of such bonds, the assent of the trustees of the Boston Metropolitan District and of the department of public utilities, would not render unconstitutional, under the "contract clause" of the Federal Constitution or otherwise, such legislation after the enactment of the pending bill, although such assents had not been procured.

Accordingly, after the enactment of the pending bill, it would be constitutionally competent for the General Court, without having procured such assents, to enact legislation regulating and fixing fares or charges for services in the conduct of such transportation system and directing the operation of particular units of the system and the character and extent of the services and facilities to be furnished thereby.

But it would not be constitutionally competent for the General Court, after the enactment of the pending bill, to enact, without such assents, legislation altering certain of its provisions relative to the determination, certification, and payment of deficiencies or deficits in the cost of service and to assessment and collection thereof, such provisions furnishing some security for the payment of the bonds.

Nor would legislation, subsequent to the enactment of the pending bill, abolishing a board of transportation constituted by the bill and providing for the appointment of a substitute board, or changing the provisions of the bill relating to tenure of office or method of appointment or removal of members of such board, be constitutionally competent without such assents.

Though doubting their duty to answer under c. 3, art. 2 of the Constitution, the Justices stated that, if any contract imported into bonds of the Boston Metropolitan District under the provisions of the pending bill should be unconstitutionally impaired by subsequent legislation, an individual holder of a bond could enforce the contract by suit; but that proprietary municipal rights, if any, which would be created by the pending bill appeared to be vested in the Boston Metropolitan District as a political division of the Commonwealth, so that no city or town in the district would have a right to maintain litigation respecting such subsequent legislation.

It is constitutionally competent for the General Court to authorize the Boston Elevated Railway Company, with the assent of sixty-five per cent of its stockholders, to convey all its property to the Boston Metropolitan District as set out in the pending bill.

It is constitutionally competent for the General Court to. provide that the Boston Elevated Railway Company should be dissolved upon purchase of its property by the Boston Metropolitan District, payment and distribution of the price, and assumption of the company's liabilities by the district, as set out in the pending bill.

It is constitutionally competent for the General Court to provide that title to the property of the Boston Elevated Railway Company should pass to the Boston Metropolitan District, as set out in the pending bill, without written conveyance.

The pending bill, if enacted, would not be subject to a referendum under art. 48 of the Amendments to the Constitution.

On June 28, 1935, the House of Representatives adopted the following order:

WHEREAS, There is pending before the General Court a bill entitled "An Act providing for the Acquisition by the Boston Metropolitan District of the Entire Assets, Property and Franchises of the Boston Elevated Railway Company", printed as House, No. 2141, a copy whereof is hereto annexed, which bill relates to the policy to be pursued by the Commonwealth with reference to public ownership by the Boston Metropolitan District of the transportation system of the Boston Elevated Railway Company and the management and operation thereof under such public ownership; and

WHEREAS, The funds necessary for the acquisition by said district of such assets, property and franchises are to be obtained under said bill by the sale of bonds of said district to the amount of many million dollars, upon the successful sale of which, at adequate prices and at reasonable

interest rates, the whole plan and purpose of said bill depend; and

WHEREAS, The interest rates which must be paid upon said bonds, the prices which said district may obtain for them, and their marketability, depend upon the rights which said bill would give to purchasers or holders of said bonds, and particularly upon the extent to which, under the terms and conditions of said bonds, as provided for in said bill, the provisions of said bill if enacted into law, could constitutionally be varied by subsequent legislation and upon the certainty as to whether or not there would be available to purchasers or holders of such bonds any effective remedy to prevent violation of such rights as are given to them by the terms of said bonds or under section fifteen of Part II of said bill; and

WHEREAS, The House of Representatives is of the opinion that the General Court ought not to proceed further in its consideration of said bill until certain grave questions of law arising in respect to the said bill are disposed of; therefore, be it

ORDERED, That the opinions of the Honorable the Justices of the Supreme Judicial Court be required on the following important questions of law:

1. If said bill is enacted into law and bonds of said district are issued and sold containing the recitals required by section fifteen of Part II of said bill, would the enactment of subsequent legislation by the General Court, (1) varying the provisions of said bill relative to the management and operation of the transportation system to be acquired thereunder, otherwise than in accordance with the provisions of said section fifteen, or (2) altering the provisions of section three of Part II of said bill regulating certain construction and the making of certain contracts or leases which would increase the capital debt of the district, or (3) authorizing such construction or the making of such contracts or leases otherwise than in accordance with the provisions of said section three, constitute a violation of section ten of Article I of the Constitution of the United States?

2. If said bill is enacted into law and bonds of said district are issued and sold as aforesaid, would it be constitutionally competent for the General Court to enact any such subsequent legislation?

3. If said bill is enacted into law and bonds of said district are issued and sold as aforesaid, would it be constitutionally competent for the General Court to enact subsequent legislation, otherwise than in accordance with the provisions of said section fifteen,

(a) Regulating or fixing fares or charges for services (see section five of said Part II);

(b) Directing the operation of particular street railway, rapid transit or bus lines or otherwise determining the character and extent of the services and facilities to be furnished (see said section five);

(c) Altering the provisions of section six of said Part II relative to the determination, certification and payment of deficiencies or deficits in the cost of service and to assessment and collection thereof;

(d) Abolishing the board of transportation created by section one of said Part II and providing for the appointment of a substitute board;

(e) Changing the provisions of said section one with reference to tenure of office or method of appointment or removal of members of said board;

(f) Modifying or changing the provisions of section five of said Part II; or

(g) Varying in any way the provisions of said bill relative to the management and operation of the transportation system to be acquired thereunder?

4. If said bill is enacted into law and bonds of said district are issued and sold as aforesaid, could an individual holder of such a bond containing the recitals required by said section fifteen maintain any action at law or suit in equity to effectively enforce such recitals in the event of the enactment of any subsequent legislation such as is set forth in each of the items specified in question three or which alters the provisions of section three of Part II of said bill regulating certain construction and the making of certain

contracts or leases which would increase the capital debt of the district, or in the event of the enactment of any subsequent legislation, otherwise than pursuant to said provisions of said section three, which authorizes any construction or making of any contract or lease as aforesaid?

5. If said bill is enacted into law and bonds of said district are issued and sold as aforesaid, could any city or town within the limits of the Boston Metropolitan District or any individual holder of such a bond containing the recitals required by said section fifteen, or any other person, maintain any action at law or suit in equity to restrain said district or the board of transportation thereof or its members or any other person from acting under or in accordance with any subsequent legislation such as is set forth in each of the items specified in question three, or which alters the provisions of section three of Part II of said bill regulating certain construction and the making of certain contracts or leases which would increase the capital debt of the district, or under or in accordance with any subsequent legislation, enacted otherwise than pursuant to said provisions of said section three, which authorizes any construction or making of any contract or lease as aforesaid?

6. Is it constitutionally competent for the General Court, as proposed in said bill, to authorize the Boston Elevated Railway Company to contract to sell, assign, transfer and convey to the Boston Metropolitan District all its assets, property, privileges and franchises upon the terms and conditions set forth in Part I of said bill, if such sale is authorized by the holders of not less than sixty-five per cent of the entire capital stock of the company, assuming that all such stock is entitled to vote?

7. In view of the provisions of sections one and three of Part I of said bill, providing for the assumption by the Boston Metropolitan District of all indebtedness, obligations and liabilities of the company, and authorizing direct action against the district at law or in equity to enforce the same, is it constitutionally competent for the General Court to provide for the dissolution of the company and

distribution of cash received from the sale of its assets, property, privileges and franchises, as set forth in section four of said Part I?

8. Is it constitutionally competent for the General Court to provide that all the assets, property, privileges and franchises of the Boston Elevated Railway Company shall be transferred to and vested in the Boston Metropolitan District without further or other conveyance, assignment, transfer, deed, agreement or writing, as provided in section three of Part I of said bill?

9. If said bill is enacted into law, would it be subject to the referendum provisions of Article XLVIII of the amendments to the Constitution of the Commonwealth?

The order was transmitted to the Justices on July 1, 1935, and on December 31, 1935, they returned the following answers:

To The Honorable the House of Representatives of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to questions contained in the order adopted on June 28, 1935, copy whereof is hereto annexed. The questions relate to a pending bill entitled "An Act providing for the Acquisition by the Boston Metropolitan District of the Entire Assets, Property and Franchises of the Boston Elevated Railway Company." That title is fairly descriptive of the scope of the bill. The Boston Elevated Railway Company was incorporated by St. 1894, c. 548. Large powers were conferred upon it: by § 4, it was authorized to mortgage or pledge its franchise and property as security for its bonds, and by § 16, it was empowered to establish a fare not in excess of five cents for a single ride, which sum could not be reduced by the Legislature during a period of twenty years. See also St. 1897, c. 500, §§ 10, 17, 19, 21. It was granted by subsequent legislation exclusive leases for terms of years of subways and tunnels. By Spec. St. 1918, c. 159, its management and operation were taken over by the Commonwealth as

a public enterprise and exercised through a board of trustees appointed by the Governor with the advice and consent of the council. That statute constituted in substance a lease of the properties of the railway company to the Commonwealth. The income derived from that operation has not been sufficient to meet required expenses at least for a part of the time, and taxes have been levied to make up the deficiency. *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403, 415, 420–421. The Boston Metropolitan District was created by St. 1929, c. 383 (see St. 1931, c. 333; St. 1932, c. 147), as a political subdivision of the Commonwealth and constituted "a district or incorporated municipality, and . . . made a body politic and corporate . . ." Its affairs are managed by a board of five trustees (hereafter called trustees), four being appointed by the Governor and one by the mayor of Boston. That district comprises Boston and certain neighboring cities and towns dependent in greater or less degree for local transportation facilities upon the system of the Boston Elevated Railway Company. According to the recitals in the order, (1) the pending bill relates to the policy to be pursued by the Commonwealth with reference to the public ownership of the Boston Elevated Railway Company by the Boston Metropolitan District and the management and operation thereof under public ownership; (2) the whole plan and purpose of the pending bill depend upon the successful sale of bonds of the district to the amount of many millions of dollars in order to obtain funds for the acquisition of the property of the Boston Elevated Railway Company; and (3) the marketability, prices, and interest rates for such bonds depend upon the rights given to their holders and particularly the extent to which the provisions of the bill, if enacted into law, could be varied by subsequent legislation and upon the certainty whether there would be available to such holders any effective remedy to prevent violation of the rights given them by the terms of the bonds and of the act.

The pending bill consists of two parts. In the several sections of Part I, provisions are made for the sale of the

property of the railway company to the district, the conditions and means by which such sale shall be accomplished and the property transferred, and the sale by the trustees of bonds issued by the district in order to procure funds to make the payments required for such purchase. The latest maturity of such bonds by § 2 of the pending bill shall be thirty-one years from the date of issue. The issue of bonds of the district to provide funds to pay bonds and other obligations and liabilities of the railway company to be assumed by the district as a part of the sale is authorized by § 5 of the pending bill for terms not exceeding sixty years. St. 1929, c. 383, § 10. The issue of bonds to purchase certain other bonds of the railway company is authorized by § 6 of the pending bill for terms not exceeding fifty years. The precise dates of the ultimate maturities of these several issues of bonds under said §§ 5 and 6 are not clear from the bill, because of the power of refunding again and again and other provisions. They may be many years hence.

The pending bill by Part II regulates the operation of the railway system under the ownership of the district. Succinctly stated, its provisions are these: By § 1, those who have been trustees of the railway company under public management are created officers of the district under the title Metropolitan Transportation Board (hereafter called the board) with the same tenure and method of appointment and removal and compensation as theretofore existing with respect to the trustees of the railway company under Spec. St. 1918, c. 159. All officers and employees of the railway company with certain exceptions become officers and employees of the district subject to control and removal by the board. By § 2, the board has possession on behalf of the district of all properties acquired under the act with exclusive authority to sell any part not necessary for the operation of the transportation system, and to make leases and contracts respecting such properties in order to obtain additional income without impairing the transportation service; it has complete management and control of the cash, mortgages, other securities and current assets

to be acquired from the railway company with authority to invest, reinvest and change investments subject to stated restrictions; and it is empowered within prescribed limits to invest moneys received from the sale of capital assets and from certain other sources for the acquisition of substitute or additional properties for the use of the transportation system. By § 3, the board is required to manage and operate the transportation system with the same powers heretofore vested in the trustees of the railway company under public management, provided that no new rapid transit extension and no new surface street railway line more than one thousand feet in length shall be constructed and no contract for the use or operation or lease of additional subways, elevated or surface street railway lines shall be entered into whereby, in the opinion of the department of public utilities, the capital debt of the district would be increased, unless authorized by the General Court upon the petition of the trustees of the district and after the filing of a certificate of said department in its office stating that such construction or contract or lease is in the public interest. By §§ 4 and 5, the board is given power (1) to fix such rates of fare and charges for services furnished, including transfers, as in its judgment are best adapted to insure sufficient income to meet the cost of service as defined in the bill, subject to a limited control vested in the metropolitan transit council (St. 1931, c. 333, § 3), and (2) to "determine the character and extent of the services and facilities to be furnished." In these respects the authority of the board is "exclusive and shall not be subject to the approval, control or direction of any state, municipal or other board or commission" save in the comparatively minor matters expressly provided in the act. By § 6, the provisions of the public control act, Spec. St. 1918, c. 159, as amended, as to a reserve fund, payment of deficits in income to meet the cost of service, and assessment and collection thereof, are to govern the financing by the district of the operation of the railway system, and deficiencies in cash required to make payments needed for management and operation shall be supplied by sale of

notes of the district by. the trustees. Further powers conferred by §§ 7 to 14 appear ·to be not dominant, but ancillary to those already summarized. By § 15, it shall be an essential part of the contract of the district with the holders of bonds issued under the· authority of §§ 2 and 5 of Part I of the bill (1) "that the provisions of this act relative to the management and operation of the transportation system to be acquired hereunder shall not be varied" by future legislation (save in particulars not here material) "except upon petition of the trustees of the Boston metropolitan district and after the filing of a certificate of the department of public utilities in its office stating that such variation is in its opinion in the public interest," and (2) that the provisions of § 3, Part II, regulating construction, contracts or leases "which would increase the capital debt of the district shall not be altered, and said bonds shall contain a recital to such effect." In view of the uncertainty as to the ultimate maturity of the bonds authorized by §§ 5 and 6 of Part I of the pending bill, these provisions may continue in force many years and possibly in perpetuity.

The point fundamental in the consideration of the first five questions in the order is whether the General Court can authorize the district to make a binding contract with the holders of its bonds, with remote ultimate maturities already described, to the effect that the bill, if enacted into law, shall not be changed by future legislation with respect to the management or operation of the railway system or increasing the capital debt of the district without the concurrence of the trustees of the district and the department of public utilities. The department of public utilities is under the supervision and control of a commission of five members appointed by the. Governor with the advice and consent of the council. G. L. (Ter. Ed.) c. 25, § 2. The aim of the pending bill is to enable the district as a political subdivision of the Commonwealth to acquire title to the railway system, to issue bonds to pay for it, and to operate it as a self-supporting public enterprise subject to certain powers vested in the metropolitan transit council by St. 1931, c. 333, § 3. If the bill is enacted, a political sub-

division of the Commonwealth will be authorized by the General Court to acquire a railway system heretofore in private ownership and to solicit the funds to pay the purchase price by selling the bonds of that political subdivision. These bonds are commercial contracts for the purpose of securing money for the district.

The power of the General Court to authorize the making of contracts by public agencies for the public welfare is undoubted. In holding valid the grant of an exclusive right to operate a railroad between designated termini for a period of thirty years, it was said that, "in addition to the lawmaking power, the legislature is the representative of the whole people, with authority to control and regulate public property and public rights, to grant lands and franchises, to stipulate for, purchase and obtain all such property, privileges, easements and improvements, as may be necessary or useful to the public, to bind the community by their contracts therefor, and generally to regulate all public rights and interests." *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1, 32. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 416. It was said in *Murray* v. *Charleston*, 96 U. S. 432, 445: "The truth is, States and cities, when they borrow money and contract to repay it with interest, are not acting as sovereignties. They come down to the level of ordinary individuals. Their contracts have the same meaning as that of similar contracts between private persons." This principle finds support in *Perry* v. *United States*, 294 U. S. 330, 352–353, where occurs the statement that "'Punctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors.' . . . the right to make binding obligations is a competence attaching to sovereignty." The right to exact fares of a specified amount for a term of years not grossly unreasonable in length, established by contract with a public service corporation pursuant to legislative authority, cannot thereafter be varied by statute without violating § 10 of art. 1 of the Constitution of the United States, although power to fix just compensation for service furnished by public utilities in general is vested in

the Legislature. *Detroit* v. *Detroit Citizens' Street Railway*, 184 U. S. 368, 384–385. *Home Telephone & Telegraph Co.* v. *Los Angeles*, 211 U. S. 265, 273. *Minneapolis* v. *Minneapolis Street Railway*, 215 U. S. 417, 434. *Detroit United Railway* v. *Michigan*, 242 U. S. 238. *St. Cloud Public Service Co.* v. *St. Cloud*, 265 U. S. 352, 355. *Railroad Commission of California* v. *Los Angeles Railway*, 280 U. S. 145, 151–152. The power of taxation to secure the payment of obligations of a municipality cannot be restricted by subsequent legislation. *Von Hoffman* v. *Quincy*, 4 Wall. 535. *Wolff* v. *New Orleans*, 103 U. S. 358, 367–368. *Seibert* v. *Lewis*, 122 U. S. 284. The essential terms of charitable gifts, when accepted by municipalities, cannot be changed by future legislation except when events have occurred which render impracticable or impossible strict compliance with those terms. They are inviolable on the ground that they are contracts and hence sheltered under § 10 of art. 1 of the Constitution of the United States. *Cary Library* v. *Bliss*, 151 Mass. 364, 375, 376. *Adams* v. *Plunkett*, 274 Mass. 453, 462, 463, 464. *Boston* v. *Curley*, 276 Mass. 549, 560. The emergency growing out of the present financial depression does not justify legislation impairing the obligation of contracts. *W. B. Worthen Co.* v. *Thomas*, 292 U. S. 426. *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56, 60.

The broad power of the General Court to represent the Commonwealth with respect to matters necessary or useful to the public, and to make or to authorize the making of binding contracts therefor, is subject to essential limitations inherent in our government. The underlying and comprehensive principle is that no contract can be made or authorized by the General Court which in effect is a surrender or renunciation of the sovereign powers of the Commonwealth. The right to exercise the police power cannot be relinquished even by explicit stipulation. *Commonwealth* v. *Boston & Northern Street Railway*, 212 Mass. 82, 85. *Opinion of the Justices*, 261 Mass. 523, 553. The doctrine that a contract specially authorized by the legislative department of government is protected by the Constitution of the United States "against impairment by

subsequent state legislation is ever limited in the area of its operation by the equally well settled principle that a legislature can neither bargain away the police power nor in any wise withdraw from its successors the power to take appropriate measures to guard the safety, health and morals of all who may be within their jurisdiction." *Texas & New Orleans Railroad* v. *Miller*, 221 U. S. 408, 414. *Pennsylvania Hospital* v. *Philadelphia*, 245 U. S. 20, 23. *Denver & Rio Grande Railroad* v. *Denver*, 250 U. S. 241, 244. In *Atlantic Coast Line Railroad* v. *Goldsboro*, 232 U. S. 548, at 558, occurs the statement that "neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant . . . ." The General Court cannot by contract impair the authority of the Commonwealth to protect the vital interests of the people. The indispensable attributes of a sovereign power cannot be bartered away or abridged, but must continue to exist notwithstanding legislative competency to make or to sanction the making of contracts for the public interest. The duty to safeguard the public health, the public morals, the public safety and the general welfare continuously rests upon the Commonwealth. Authority to enact all manner of wholesome and reasonable laws for the good and welfare of the Commonwealth is conferred upon the General Court and cannot in its main features be fettered for the future by legislative action. *Commonwealth* v. *Alger*, 7 Cush. 53, 85. *Commonwealth* v. *Strauss*, 191 Mass. 545, 550–551. *Boston & Albany Railroad* v. *New York Central Railroad*, 256 Mass. 600, 610. *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 529. The line of demarkation between the paramount prohibition against impairing the obligation of contracts and "the necessary residuum of state power," while constantly recognized, is frequently difficult to establish. *Home Building & Loan Association* v. *Blaisdell*, 290 U. S. 398, 434–437.

The relations of the Boston Elevated Railway Company and the Commonwealth have already received some consideration. It was held in *Boston v. Treasurer & Receiver General*, 237 Mass. 403, 415, 416–417, that the public control act, Spec. St. 1918, c. 159, constituted when accepted by the railway company a lease of its property to the Commonwealth. See *Opinion of the Justices*, 231 Mass. 603, 608–609. In *Opinion of the Justices*, 261 Mass. 523, 552–553, and *Opinion of the Justices*, 261 Mass. 556, 602, the view was expressed that the particular terms of Spec. St. 1918, c. 159, and of the bills then pending, as to amendments of that chapter, declared to constitute contracts on the part of the Commonwealth and of the railway company, were of such nature as not to be subject to revocation, alteration, or amendment by the General Court. It was pointed out that the exercise of the police power was not thereby narrowed. The statute and proposed bills then under examination related to a lease of its property by the railway company to the Commonwealth for definite and comparatively short periods of time. They vested for those limited periods the entire management and operation of the railway system in the trustees for public control. They contained for that period the same exclusive grant to those trustees of powers as to fares and charges and the character and extent of services and facilities to be furnished, which are conferred upon the board in § 5 of Part II of the pending bill. See Spec. St. 1918, c. 159, § 2; 261 Mass. 523, at page 529 and at page 583. They did not contain provisions similar to those embodied in §§ 2, 3 and 15 of Part II of the pending bill. The lease of a railway system by its owner to the Commonwealth for a defined and reasonably limited time is different from the issuance of bonds of remote and indeterminate ultimate maturities, with special preferential features, for the purchase and operation of such a system by a political subdivision of the Commonwealth established as an incorporated municipality. The power of establishing municipal corporations is vested in the General Court. While the contracts of such corporations cannot be impaired, the authority to make such contracts does

not involve an agreement that the municipality or its particular offices shall continue to exist. *Stone* v. *Charlestown*, 114 Mass. 214, 223. The General Court may "amend their charters, enlarge or diminish their powers, extend or limit their boundaries, consolidate two or more into one, and abolish them altogether, at its own discretion." *Weymouth & Braintree Fire District* v. *County Commissioners*, 108 Mass. 142, 144–145. *Commonwealth* v. *Plaisted*, 148 Mass. 375, 386. It has been held, however, that contracts made by municipalities in accepting charitable gifts may be valid and secure against legislative impairment to the extent of assuring in perpetuity the same or essentially the same board of public officers as managers. *Cary Library* v. *Bliss*, 151 Mass. 364, 372–373. *Adams* v. *Plunkett*, 274 Mass. 453, 462, 463, 464. *Boston* v. *Curley*, 276 Mass. 549, 560.

The provisions of the present bill exceed the bounds of those hitherto considered in *Opinions of the Justices*, 261 Mass. 523, and 261 Mass. 556, in respect to limitations upon legislative power touching the relations of the Commonwealth and the Boston Elevated Railway Company.

The dominant purpose of the pending bill is to enable the district to acquire title to the railway system with the privileges and franchises of the railway company, to provide for its operation through public officers, and to sell bonds to raise the necessary funds. In order to make those bonds more salable, limitations are imposed upon the exercise of legislative powers in respect to the management and operation of the railway system and its extensions as prescribed in the bill and in respect to increases in the capital debt of the district. Those limitations prevent for the future, except as provided in §§ 3 and 15 of Part II, modification, change or alteration by the General Court in the appointment and tenure of the members of the board, in the exclusive power of the board to sell property devoted to railway uses and to make contracts concerning the same, in the complete control by the board over cash, mortgages, notes, securities and other current assets acquired from the railway company and over the investment, reinvestment and sale of the same

within specified limits, and in the wide authority of the board to manage the railway system, to determine the character and extent of the service to be afforded, and to fix fares and charges for service. The provisions of § 3 of Part II of the bill as to increasing the capital debt of the district are indefinite as to time. Whether in any circumstances such limitations might be made so clear and specific as to be exempt from change by future legislation, need not be considered. See *Board of Education* v. *Phillips*, 67 Kans. 549; *Rowekamp* v. *Mercantile-Commerce Bank & Trust Co.* 72 Fed. Rep. (2d) 852, 857–858. Other matters just mentioned, including regulation of fares, are in general under legislative control and are bound together with vital matters as to which under the pending bill the General Court is subject to restrictions dependent upon affirmative concurrent action of two public boards. Other stringent restrictions with respect to the future development and extension of lines of the transportation system are set forth in § 3 of Part II. The pending bill fixes no definite and reasonable term for the continuance of any or all of these restrictions; they persist during the terms of the bonds to be issued, which, as already pointed out, so far as issued under §§ 5 and 6 of Part I, are indefinite as to time dependent upon refunding "again and again." These restrictions might hamper for the future the general welfare of the people served by that transportation system.

These restrictions and limitations are not absolute. Legislative change in these particulars, however, is in effect prohibited except upon the petition of the trustees of the district and a certificate of the department of public utilities that in its opinion such change is in the public interest. Thus the concurrent approval of two official bodies is a condition precedent to such change. These boards are established by statute. Such boards commonly are subject to legislative reorganization and change. The members of each of these boards are appointed for considerable terms. Their duties require the members to be familiar with the transportation facilities and needs of the district. Those restrictions and limitations are substantial; they might preclude

legislative action on important matters or delay such action for considerable periods of time. If the pending bill were enacted, these boards might fail to agree in sanctioning any variations in the statute.

Some limitations and restrictions of this nature might be permissible as a part of the contract embodied in bonds to be issued by the district, and be secure against future legislative alteration. For example, the substantial continuance of the board of management as to tenure and appointment, *Adams* v. *Plunkett*, 274 Mass. 453, 462–463; *Detroit* v. *Detroit Citizens' Street Railway*, 184 U. S. 368, 382; *Perry* v. *United States*, 294 U. S. 330, 352; regulation of fares and charges for services, *Railroad Commission of California* v. *Los Angeles Railway*, 280 U. S. 145, 151–152; and rules touching methods of financing the district as to determination, certification and payment of deficiencies in the cost of service and assessment and collection thereof, *Seibert* v. *Lewis*, 122 U. S. 284. The pending bill goes further.

The maintenance and operation through the medium of public officers of a very large and vital street railway system to be bought, paid for and owned by a political subdivision of the Commonwealth are of high concern to the general welfare. They require at the outset the exercise of sovereign powers. They may present from time to time during the life of the bonds authorized under the pending bill imperative problems calling upon the General Court to exercise its judgment to determine whether and how it will put forth its inalienable powers. The Constitution by c. 1, § 1, art. 4, confers full power and authority upon the "general court, from time to time, to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances . . . as they shall judge to be for the good and welfare of this commonwealth." In our opinion it is not consonant with this broad grant to narrow its sweep as provided in the pending bill by requiring for a period of time reaching indefinitely into the future the assent of two public boards created by statute before the General Court can consider favorably the enactment of amendments of general public importance to the pending

bill after it becomes law. The circumstance that these restrictions are a part of the bonds by which money is to be borrowed to acquire the railway system does not lift them into the class of contracts beyond the reach of inalienable legislative power in the conditions here shown. It is not necessary to point out in further detail the differences between the bills under consideration in previous opinions touching the relations of the Commonwealth and the Boston Elevated Railway Company and the pending bill. Those bills related to a lease by the railway company as owner of the transportation system to the Commonwealth for definite periods of time with certain rights reserved to the Commonwealth. The pending bill covers a wider field, in that it relates to the purchase of that transportation system by a political subdivision of the Commonwealth and to its operation and management for an indefinite and possibly very long period of time by public officers clothed with extensive powers over that system; and it contains stringent, if not permanent, restrictions on the competency of the General Court to legislate for the public welfare concerning that system; all to the end that bonds to be sold to obtain funds with which to make the purchase may have greater security and therefore, when sold, may yield a higher price to the treasury of that political subdivision.

The questions must be answered subject to the principles already stated.

The first question is answered in the negative. The three points specified in that question stretch beyond the contract powers of the General Court and reach into the domain of powers which are inalienable as applied to the subject of the proposed bill.

The second question is answered in the affirmative.

The several subdivisions of the third question involve further factors. The rates of fare and amounts of charges for services rendered by the railway system afford some security for the payment of the bonds. That is a subject about which binding contracts for a fixed time not grossly unreasonable in length might be made under legislative

authorization which would not be subject to change by future statutes. The pending bill does not undertake to do that; it is indefinite as to time and restricts to a substantial extent the legislative power over the subject for an indefinitely long period.

The character and extent of the services and facilities to be provided by such a railway system for a period of time indefinite in length, we think, are matters so vitally concerning the welfare of the inhabitants of the district and of the general public that their regulation as provided in the pending bill cannot be surrendered by the General Court. The pending bill in this aspect is so indeterminate as to time that it is not within the scope of what was said in *Opinions of the Justices*, 261 Mass. 523, 553, and 261 Mass. 556, at page 602.

The provisions of the bill relative to the determination, certification and payment of deficiencies or deficits in the cost of service, and to the assessment and collection thereof, furnish some security for the payment of the bonds. Provisions touching that subject, within reasonable limitations, might become a part of the obligation of bonds, secure against legislative impairment. Those provisions in the pending bill cannot, we think, be pronounced in excess of legislative competency.

Efficient and experienced management of the railway system is highly desirable. Public ownership commonly entails the result that the continuance of any board of management would be under legislative control. Nevertheless, there are strong analogies between the principles governing a contract made as to the board of management of a publicly owned charity, which cannot be impaired by subsequent legislation (*Cary Library* v. *Bliss*, 151 Mass. 364, *Adams* v. *Plunkett*, 274 Mass. 453), and the principles governing a similar contract made with those who furnish the money to enable an incorporated municipality to buy a privately owned railway system.

The vice of the pending bill consists mainly in the indeterminate but certainly prolonged period of time during which legislative regulation concerning important features

of the transportation system would be greatly hindered, if not rendered impracticable. It is impossible to forecast that, for so long, no public exigency may arise demanding legislative alteration in the pending bill, if enacted into law, in the exercise of inalienable powers. It follows that, subject to the limitations already amplified, to question numbered 3 we answer "Yes" as to (a), (b), (f) and (g), and "No" as to (c), (d) and (e).

It is doubtful whether a solemn occasion is presented by questions four and five so as to warrant answers under c. 3, art. 2, of the Constitution. In general, it may be said that whatever rights, contractual in nature, are possessed by holders of bonds, may at their suit be enforced in the courts. It is not now perceived that cities and towns have such rights under the pending bill as would enable them to maintain litigation in the courts. They have no private rights in the subject. Whatever proprietary municipal rights, if any, would be created by the pending bill, if enacted into law, appear to be vested in the Boston Metropolitan District as a political subdivision of the Commonwealth and not in the several cities and towns composing that district. See *Mount Hope Cemetery* v. *Boston*, 158 Mass. 509; *Bolster* v. *Lawrence*, 225 Mass. 387, 390; *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 418. The rights of the public have not in this respect been lodged in these cities and towns. See *Arlington Board of Survey* v. *Bay State Street Railway*, 224 Mass. 463, and cases there reviewed; *Donham* v. *Public Service Commissioners*, 232 Mass. 309, 328.

The sixth question is answered in the affirmative. The reasons are stated at length in *Opinion of the Justices*, 261 Mass. 556, 594, 595, 602.

The seventh question is answered in the affirmative. The controlling reasons have been elaborated on previous occasions and need not be repeated. *Opinion of the Justices*, 261 Mass. 556, 596–600. *Stone* v. *Framingham*, 109 Mass. 303, 305.

The eighth question is answered in the affirmative. There is no doubt of the power of the General Court to

authorize a transfer of the title of property to a territorial subdivision of the Commonwealth for public use without any written instrument. *Bryant* v. *Pittsfield,* 199 Mass. 530, 532. *Turner* v. *Gardner,* 216 Mass. 65, and cases cited.

The ninth question is answered in the negative. The grounds for that view are set forth in *Opinion of the Justices,* 261 Mass. 523, 553–554. See also *Christian* v. *Secretary of the Commonwealth,* 283 Mass. 98, 105.

> ARTHUR P. RUGG.
> JOHN C. CROSBY.
> EDWARD P. PIERCE.
> FRED T. FIELD.
> CHARLES H. DONAHUE.
> HENRY T. LUMMUS.
> STANLEY E. QUA.